IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Rodney L. Cogdell,<br><br>    Plaintiff,<br><br>vs.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>    Defendant. | Civil Action No. 8:10-105-JFA-BHH<br><br>**REPORT AND RECOMMENDATION<br>OF MAGISTRATE JUDGE** |

  This case is before the Court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

  The plaintiff, Rodney L. Cogdell, brought this action pursuant to Section 205(g) of the Social Security Act, as amended, (42 U.S.C. Section 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security Administration regarding his claim for disability insurance benefits ("DIB") under Titles II and XVI of the Social Security Act.

## RELEVANT FACTS AND ADMINISTRATIVE PROCEEDINGS

  The plaintiff was 37 years old on the amended alleged onset date of April 11, 2006[2] (R. at 630) and 40 years old as of the date of the decision of the Administrative Law Judge (ALJ). (R. at 85, 633.) It appears that while he attended ninth grade, he did not pass, and did not obtain a GED.[3] (R. at 496-501, 604, 634.) He has past work as a car detailer, pizza delivery driver, and a dump truck driver. (R. at 90-91, 95.) He alleges he became disabled due to the residual effects of a "stroke," high blood pressure, chest pain, gastrointestinal reflux disease (GERD), and emphysema, in combination with depression,

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[2] The alleged onset date was amended at the beginning of the February 5, 2009, hearing.

[3] School records show he was absent 51 school days, received mostly F's, and did not receive credit for any Units.

anxiety, chronic obstructive pulmonary disease (COPD), and borderline intellectual functioning. (R. at 18, 89-90.)

The plaintiff applied for SSI and DIB disability insurance benefits on May 3, 2004. (R. at 570-572.) His application was denied in an initial determination and upon reconsideration. (R. at 61-70, 563-69.) Hearings were held on January 23, 2007 (R. at 560, 591-99) and November 15, 2007. (R. at 600-26.) On July 14, 2008, in an unfavorable decision, the ALJ found that plaintiff was not disabled within the meaning of the act. (R. at 410-30.) The Appeals Council remanded the case (R. at 43-45), and a new hearing was held on February 5, 2009, at which claimant amended his onset date. (R. at 627-62.) On July 7, 2009, in another unfavorable decision, the ALJ found that the plaintiff was not disabled within the meaning of the act. (R. at 16-34). As the Appeals Council denied the plaintiff's request for review (R. at 8-11), the ALJ's decision became the Commissioner's final decision for purposes of judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.
>
> (2) The claimant has not engaged in substantial gainful activity since April 11, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3) The claimant has the following severe impairments: depression, anxiety, chronic obstructive pulmonary disease (COPD) and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925, and 416.926).
>
> (5) After careful consideration of the entire record, I find that the claimant has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: he must avoid concentrated exposure to fumes; can perform

2

only simple, 1-2 step tasks. He requires a low stress work environment defined as the inability to do production work requiring high speed or volume; and is limited to occasional contact with coworkers.

(6) The claimant is capable of performing past relevant work as a dump truck driver, which requires medium exertion, is unskilled and has a SVP of 2. This work does not require the performance of work-related activities precluded by the claimant's RFC (20 CFR 404.1565 and 416.965).

(7) The claimant has not been under a disability, as defined in the Social Security Act, from April 11, 2006, through the date of this decision(20 CFR 404.1520(f) and 416.920(f)).

## **APPLICABLE LAW**

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. §423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, the Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. *See* 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. Social Security Ruling ("SSR") 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966). Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the

Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## DISCUSSION

The plaintiff contends that the ALJ erred in failing to find him disabled. Specifically, the plaintiff alleges that the ALJ erred (1) in failing to find that his low cognitive function in combination with other impairments, meets and/or equals the criteria of Listing 12.05C; (2) in rejecting the claimant's treating psychiatrists' medical source statements; (3) in his residual functional capacity analysis; and (4) failing to find him credible. The ALJ's decision is notably thorough. While the Court takes issue with the legal propriety of some of the ALJ's findings, it is plainly not for a lack of diligence and thoughtful consideration.

The Court will address each alleged error in turn.

**I. LISTING 12.05**

The plaintiff first contends that the ALJ failed to recognize that medical evidence established the presence of a disabling mental impairment listed in section 12.05 of Appendix 1 to 20 C.F.R. § 404, Subpart P. Section or Listing 12.05 states in relevant part:

> 12.05 Mental Retardation and Autism: Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (before age 22) . . . The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> C. A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitations of function;

20 C.F.R. pt. 404, Subpart P, App. 1, § 12.05. Under Section 12.05(**B**), therefore, if the plaintiff demonstrates an IQ score of less than 60 he is automatically considered disabled.

5

In contrast, there are two requirements under Section 12.05(**C**), which is at issue here. *See Boatwright v. Secretary, Dept. of Health and Human Services*, 1989 WL 79720, at *2 (4th Cir. July 12, 1989). First, a claimant's I.Q. score must come within the listed range of 60 through 70, and second, he must be able to demonstrate an additional significant limitation. *See id.* at *2. If both requirements are met, then the plaintiff is considered disabled and entitled to benefits. *See id. at *3;* 20 C.F.R. § 416.920(d) ("If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.").

The prevailing view among the circuit courts of appeal is that the plaintiff also must satisfy the diagnostic description in the introductory paragraph of Listing 12.05 in addition to one of the four sets of criteria, defined in subsections A, B, C, or D. As quoted above, that introductory paragraph states that mental retardation "refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior . . . ." 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.05. A recent and thorough discussion by the Fifth Circuit, which included a survey of relevant decisions, concluded that a claimant must, in fact, establish both the diagnostic portion of the introductory paragraph in addition to one of the severity indicators, delineated in subsections A - D. *See Randall v. Astrue*, 570 F.3d 651, 657-59 (5th Cir. June 8, 2009). The Fourth Circuit has apparently not directly considered it.

Frankly, the ALJ's analysis is somewhat difficult to follow. Admittedly, in sheer volume of words, it is one of the more thorough Listing analyses that the Court has seen. Notwithstanding, it appears to try and consider the criteria of Listings 12.04, 12.05, and 12.06 all at the same time. Over the course of its 4 pages (R. at 20-23), the ALJ continually references "B" and "C" criteria when discussing Listing 12.05, when the criteria he is referencing is plainly from Listing 12.04 (see, e.g., R. at 22 (regarding paragraph D of 12.05, the ALJ states, "As explained above, the "B" criteria are not met."); R. at 23 (concluding

broadly that the plaintiff has not met the "marked" limitations and decompensation requirements of criteria B and C.)

Focusing on the portions of the analyses expressly related to 12.05, the ALJ analyzed whether the plaintiff had met the requirements of any of its four subsections. (R. at 22.) The entirety of his analysis regarding subsection C, specifically included the following three sentences:

> In terms of the requirements in paragraph C, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. Dr. Tollison said claimant's intellectual functioning fell between the levels of mental retardation and borderline intellectual functioning. Neither Dr. Wiley not Dr. Kazaglis, both treating psychiatrists, indicated claimant was disabled due to mental retardation.

(R. at 22.)

As an initial reaction, it was plain error to have concluded that the plaintiff "does not have a valid verbal, performance, or full scale IQ of 60 through70." *Id*. Dr. David Tollison performed a psychometric assessment on January 26, 2009, utilizing the WAIS-III. (See R. at 529.) Current intellectual function measured as follows: Verbal IQ 70, Performance IQ 76, and Full Scale IQ 70. Dr. Tollison stated that the test results were valid, and characterized them as falling "on the edge between Mild Mental Retardation and Borderline intellectual functioning and represents the 2nd percentile nationally." (R. at 529.) Dr. Joseph Hammond, who re-tested the claimant at the direction of the ALJ, concluded that the slightly higher results he obtained were not valid, because retest causes an increase in the Performance IQ score. (R. at 470.) Even still, the plaintiff posted for Dr. Hammond a 68 Verbal, a score within the required range. *Id*. He did not challenge the validity of Dr. Tollison's test results. *Id*. Although this evidence was acknowledged in the decision (R. at 26-27), for some reason the ALJ did not recognize it as satisfying the score criteria of the Listing. The ALJ cited no evidence, substantial or otherwise, for rejecting two scores within

7

Subsection C's required range. (See R. at 22.) Additionally, it cannot be said that the ALJ gave any consideration the non-score criteria of subsection C, whether any physical or other mental impairment imposed an additional and significant work-related limitations of function. *Id*. Instead, the ALJ simply observed that no physician had ever concluded that the plaintiff was disabled due to mental retardation. *Id*. That fact, however, is non-dispositive and the Court is unpersuaded by the substantialness of the ALJ's consideration of subsection C otherwise.

Even still, it seems that a remand is likely not in order on this objection. Namely, the ALJ plainly found that the plaintiff could not meet the diagnostic description in the introductory paragraph of Listing 12.05. Where he was short in considering the subsection itself, the ALJ spent significant energy considering whether the plaintiff had "deficits in adaptive functioning," 20 C.F.R. pt. 404, Subpart P, App. 1, § 12.05(C). (R. at 22.) In this conclusion, the ALJ was largely compelled by evidence of the plaintiff's daily activities. (R. at 22-23.) This was proper. *See Battle v. Astrue*, 243 Fed. Appx. 514, 521 (11th Cir. 2007) (considering daily activities in analyzing adaptive deficiencies). The ALJ noted, for instance, that the plaintiff was able to care for his personal needs, as evidenced by his reports and examiners who noted he was appropriately dressed and groomed. (R. at 22, 262, 469, 575, 503, 528.) At home, he was able to supervise his young children, cook, clean, cut the grass, do laundry and housework, and put together model cars. (R. at 22, 132, 134, 273, 468, 648-49.) Socially, he had a girlfriend; lived with her, her mother, and their children; visited his mother and other family members; shopped; and said he got along with authority figures. (R. at 22, 133, 136, 273, 468, 527.) He was also able to arrange and follow through on a deal to buy prescription drugs off the street in another town. (R. at 22, 377, 645-47.) He was able to pass a driver's test, drive, obey the rules of the road, and use the post office. (R. at 22, 133, 273, 644-45.) The ALJ noted tht he sought medical attention when needed and took his medications. (R. at 23.) He obtained some A's in science classes, indicating he was able to function at least to some degree academically. (R. at

496-501, 585-90.)  The plaintiff worked in the past for many years, which required him to learn and apply instructions and interact with other people.  (R. at 23, 135-36.)  The plaintiff was able to give detailed histories to his treatment providers, read, write, do simple math, complete forms in connection with his disability claim, and appropriately respond to questions at his administrative hearings.  (R. at 23, 262, 399, 468, 529.)  This is all substantial evidence of adaptive functioning.  *See Battle*, 243 Fed. Appx.at 521.

The plaintiff, of course, has contested some but not all of this.  The plaintiff contends that the record actually shows that he leads a very limited life. The plaintiff emphasizes his testimony that he is able to make sandwiches and heat frozen food (R. at 132), can grocery shop sometimes, but generally stays at home. He reported feeling afraid when around strangers (R. at 503), as he was badly beaten in his 20's, and required facial reconstruction (R. at 262, 468, 502, 636).  Of course, the fact that the plaintiff can produce evidence, which might be interpreted differently is of no moment.  *See Blalock*, 483 F.2d at 775.  As recited, the ALJ had substantial evidence to conclude as he did and the Court will not disturb his decision.

The plaintiff also argued that the ALJ made no attempt to evaluate whether the claimant had failures of adaptive functioning as of age 22.  But, the critical point is that the ALJ found no issues with adaptive functioning *now*.  While a claimant cannot meet Listing 12.05(C) without showing that the impairment existed prior to age 22, neither is that particular showing alone sufficient.  The Listing, by its very nature, presumes that the plaintiff will show that the adaptive functioning, while originally and necessarily manifesting at a young age, is currently present.  That is the definition of disability under the regulations. 42 U.S.C. §423(d)(1)(A) (disability must have "lasted or can be expected to last for at least 12 consecutive months.")  So whatever failure might have existed in the examination of early evidence of deficits in the plaintiff's adaptive functioning, it does not affect the ALJ's analysis of evidence that such deficits do not exist now.

9

For all these reasons, the ALJ's application of Listing 12.05, while less than perfect and, in some cases, actually in error, is largely based on substantial evidence. A remand to correct the problems recited, would not, in fact, change the outcome because there is no error in the ALJ's conclusion that the plaintiff's condition does not meet the diagnostic description. Accordingly, all other errors are harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating claimant's pain because "he would have reached the same conclusion notwithstanding his initial error").

## II.     Treating Physicians

The plaintiff next contends that the ALJ improperly rejected the opinions of two treating psychiatrists, doctors Jon Kazaglis and Dana Wiley, who collectively have treated the claimant for almost four years. As always, the medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. §416.927(d)(2)(2004); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). A "medical opinion," is a "judgment[ ] about the nature and severity of [the claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. A treating physician's opinion may be assigned little or no weight if it is conclusory. *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir.1996).

### A.     Dr. Kazaglis

Dr. Kazaglis testified that the plaintiff is a simple man, likely mentally retarded, who as a result of his depression, anxiety, COPD, and limited cognition cannot be effective in handling normal stress, making simple decisions, being reliable, behaving in an emotionally

stable manner, and every other occupational adjustment. (R. at 338.) The ALJ "assigned no weight" to Dr. Kazaglis' opinion because (1) his opinions were based exclusively on the plaintiff's subjective complaints; (2) Dr. Kazaglis had previously found that the claimant's primary limitations were from physical causes and only secondarily from psychiatric causes; and (3) Dr. Kazaglis had observed that the claimant's symptoms of anxiety and depression significantly improved on medication. (R. at 32-33.)

The plaintiff contends that the record as a whole is replete with objective examples of the plaintiff having impaired function due to anxiety as opposed to physical causes and not based simply on the plaintiff's subjective complaint's alone. (See R. at 135, 162, 215, 241-242, 263). When he saw Dr. Gal Margalit for a physical exam, he vomited in the examining room from "nerves." (R. at 449.) The plaintiff was often found unable to fill out forms effectively (R. at 331) and has difficulty understanding instructions about his treatment (R. at 502). In fact, Dr. Margalit expressly noted that the plaintiff's "perceptions [of pain] are real, but the cause is not physical but psychological." (R. at 404-405.)

In his defense of the ALJ, which is notably brief, the defendant has emphasized that Dr. Kazaglis' own notes showed the plaintiff's depression and anxiety improved with treatment and that, although Dr. Kazaglis is a mental health professional, his opinions that plaintiff had mostly "poor" abilities to function in the workplace (R. at 337-38, 342-43) appeared to be largely premised on what the defendant would characterize as the plaintiff's misrepresented physical limitations (R. at 32). The defendant also argues that the plaintiff apparently convinced Dr. Kazaglis that he was on the brink of death due to his physical impairments (R. at 339), in contrast to medical evidence which the ALJ believed showed minimal impairments, generally controlled with medications, and which caused no significant functional restrictions.

As between the parties, particularly the plaintiff, there is even more. The Court need not address it all in its significant detail. While the Court would almost always demur to resolving a dispute of competing evidence as present here, and would in nearly all cases

11

affirm the ALJ precisely for the presence of a debatable conflict over competing corpuses of substantial evidence, here the ALJ went too far. The ALJ found Dr. Kazaglis' opinion worthy of "no weight" whatsoever. This seems a remarkable result considering the fact that Dr. Kazaglis indisputably treated the plaintiff as a psychiatrist for mental problems, which the ALJ concedes are severe, if only not as severe as the plaintiff might contend. How Dr. Kazaglis' opinion could simply be irrelevant strains imagination, especially based on the limited inconsistencies recited between the plaintiff's daily activities, his subjective representations, and some of the conclusions of Dr. Kazaglis. This district has commented that such "inconsistencies" do "not support wholesale disregard for the treating physician's opinions." *See Farmer v. Astrue*, 2010 WL 500450, at *2 (D.S.C. February 05, 2010). In *Farmer* the following portion of Social Security Ruling 96-2p was emphasized:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," ***not that the opinion should be rejected***. Treating source medical opinions ***are still entitled to deference*** and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. ***In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.***

*See Farmer*, 2010 WL 500450, at *2 (quoting SSR 96-2p (emphasis in original).) In other words, a treating physician's opinion, even where it is not consistent with other substantial evidence of record, is not worthless. The ALJ has not explained how a treating psychiatrist's opinion has simply no value in shaping the plaintiff's RFC.

Frankly, this is a fairly common result and one over which the undersigned has had increasing concern. In almost every case, there is some inconsistency which an ALJ may play upon to diminish a treating physician's view. But, surely that cannot be the meaning of *Mastro*, *Craig*, and the regulations. If the deference extended a treating physician, precisely for its presumably better vantage, is to mean anything at all, it is a presumption

12

as against other evidence of record. Surely that deference does not have force only after the treating opinion is demonstrated to be the lone voice on an issue or without any critics whatsoever. But, even where a treating opinion has proved undeserving of controlling weight, there is a range of other value the ALJ might afford it. Here, there has not been appropriate explanation.

### A. Dr. Dana Wiley

The Court reaches the same conclusion regarding the ALJ's consideration of Dr. Dana Wiley's opinion. Psychiatrist Dana Wiley, M.D., began treating the claimant in May 2008 (Tr. 527). After treating him monthly (R. at 523-526), Dr. Wiley performed a psychiatric evaluation of the claimant in January 2009. (R. at 502-520.) Dr. Wiley stated that as a result of the combined effects of mood disorder, panic disorder and borderline to mentally retarded function, the claimant has poor ability to make any sort of occupational adjustments, demonstrate reliability, or behave in an emotionally stable manner, with very limited ability to maintain concentration and deal with stress, or interact appropriately due to feelings that people are acting against him. (R. at 503.) The ALJ, however, rejected this opinion, concluding, "I have found that claimant has no exertional limitations and his allegations of pain . . . . are not substantiated by objective findings. Claimant's mental impairments are the only impairments causing limitations in his ability to performed sustained work. Therefore I cannot assign any credibility or weight to Dr. Wiley's statement that these conditions increase and mimic his symptoms of anxiety . . . . (R. at 32.) The ALJ's conclusion was based on his concern over Dr. Wiley's belief that the plaintiff's hypertention and lung-disease "increase or mimic his symptoms of anxiety which further worsens his psychiatric condition." (R. at 506.) Because the ALJ found that those physical conditions – hypertension and lung-disease – were well, as opposed to "poorly," *id.*, controlled, he rejected Dr. Wiley's *entire* opinion. This is a fairly remarkable result.

First, the interplay between the plaintiff's physical and mental conditions was only one observation made by Dr. Wiley, which, even if somehow in error, would not justify a

13

wholesale dismissal of the overall opinion. Dr. Wiley's disability assessment had numerous bases. He noted that the plaintiff had "difficulty at times understanding treatment instructions," and he felt this was consistent with the recently-obtained IQ measurement. (R. at 503.) Further, Dr. Wiley found that while the plaintiff could perform serial sevens (subtracting 7 from 100 and downward); he used his fingers to count. *Id*. He also noted that the claimant had COPD, hypertension, gastric reflux and back pain. *Id*. He noted that if the claimant had to sit in the waiting room "with a lot of people", he would be anxious. *Id*. Dr. Wiley reported that the plaintiff had been assaulted at age 29 during a robbery attempt, and he felt generally that people were "out to get him." *Id*. Dr. Wiley diagnosed a mood disorder, panic disorder with agoraphobia, rule out bipolar disorder, rule out post traumatic stress disorder, and borderline intellectual functioning/mild mental retardation, and assigned a GAF of 40-45. *Id*. (representing severe enduring mental problems without consideration of any developmental or physical issues; see DSM-IV at 32). The portion of the opinion keyed upon by the ALJ was included under Section IV, entitled OTHER WORK-RELATED ACTIVITIES, and which solicited "any other work-related activities which are effected by the impairment, and indicate how . . . ." (R. at 506.) At this point, Dr. Wiley identified what he believed was an emotional overlay to the hypertension and lung-disease, which he believed either increased or mimicked the plaintiff's symptoms of anxiety.

Even were the ALJ correct that serious hypertension and lung-disease could not be established and, therefore, that the entirety of the Section IV observation should not be accepted, this would not lead reasonably to a rejection of the entire opinion, which recited numerous other grounds.

Second, as the plaintiff complains, the ALJ's reasoning in this regard seems to pit, as inconsistent, Dr. Wiley's belief that the physical limitations were poorly controlled, not against other specific evidence of record, as required, but against the ALJ's own decision that those physical impairments did not cause any limitations to the plaintiff's ability to perform sustained work. Simply because the ALJ, himself, balancing the evidence, found

14

no related impairments, does not mean that Dr. Wiley, at the time of his opinion, did not have reasonable evidence to make the observation that he did.

All told, the ALJ's reasoning, again, seems less than adequate to reduce, in one gesture, Dr. Wiley's opinion from non-controlling to worthless. A remand, therefore, is in order to clarify the reasons for any weight given to Drs. Kazaglis' and Wiley's opinion and how those opinions, to whatever extent revalued, effect the RFC, if not the Listing analysis. While the Court is largely satisfied with the basis for the ALJ's listing analysis that the plaintiff cannot satisfy 12.05, additional deference to the treating psychiatrists still might result in a determination of disability depending on a materially changed RFC.

### III.     Residual Functional Capacity

As a result of the Court's recommendation concerning the plaintiff's treating psychiatrists, the RFC assessment will necessarily be reopened regardless of the plaintiff's additional complaints about it. Nonetheless, the Court would also make the following brief comments.

The plaintiff complains that notwithstanding the ALJ's express adoption of the State Agency's findings (R. at 33), the ALJ failed to include, in his hypothetical to the vocational expert, the State Agency's complete restriction that the plaintiff not be exposed to "dust, fumes, gasses, odors, poor ventilation, etc." (R. at 301). The hypothetical only included a restriction concerning fumes. (R. at 651.) The defendant responds that the plaintiff's past relevant work as a dump truck driver, does not include, according to the Dictionary of Occupational Titles, exposure to atmospheric conditions, radiation, toxic caustic chemicals, or other environmental conditions, such that any failure to include the full restriction is harmless. *See* DOT No. 902.683-010. But, the elements left out, dust, odors, and gasses, are not the sort of elements, which the DOT indicates are not present. As far as the Court has been formed, "dust," for example would not be obviously contemplated by the categories of atmospheric conditions, radiation, toxic caustic chemicals, or other environmental conditions. Even still, the plaintiff, himself, has not made any particular

15

showing concerning the exposure to dust and gasses and odor in the course of the performance of his past relevant work. But, because the case must otherwise be remanded, it seems like an issue worthy of additional exploration.

To the extent the plaintiff complains that the ALJ failed to adopt the full manner of Dr. Joseph Hammond's opinion, such was not the ALJ's representation. Instead, the ALJ indicated that the opinion had been given "probative weight" and was largely consistent with the RFC adopted. It does not seem to the court that such findings would have bound the ALJ to adopt in every single detail Dr. Hammond's opinion, as the plaintiff would generally contend. There is no error as between the way the ALJ characterized his reliance on Dr. Hammond's opinion and the actual degree of that reliance, as reflected in the RFC.

## IV. Plaintiff's Credibility

The plaintiff next contends that the ALJ failed to properly evaluate his subjective symptoms. Federal regulations, 20 C.F.R. §§ 416.929(a) and 404.1529(a), provide the authoritative standard for the evaluation of pain in disability determinations. *See Craig v. Chater*, 76 F.3d 585, 593 (4th Cir. 1996). Under these regulations, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Id.* at 594. First, "there must be objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 591 (quotation and emphasis omitted). This threshold test "does not . . . entail a determination of the 'intensity, persistence, or functionally limiting effect' of the claimant's asserted pain." *Id.* at 594. Second, and only after the threshold inquiry has been satisfied, "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated." *Id.* at 595. When the ALJ fails to "expressly consider the threshold question" and instead proceeds "directly to considering the credibility of [the] subjective allegations of pain," remand is warranted. *Id.* at 596.

It is critical to proceed through the steps in order, because "once objective medical evidence establishes a condition which could reasonably be expected to cause pain of the

16

severity a claimant alleges, those allegations may not be discredited simply because they are not confirmed by objective evidence of the severity of the pain . . . ." *Id.* at 593. Said differently, once an ALJ concludes that an impairment could reasonably be expected to produce the pain alleged, he ought to view any inconsistency or defect in the plaintiff's subjective testimony through a more discriminating lense because the plaintiff's subjective allegations, at that point, are consistent with the objective expectations.

The plaintiff has not contested the ALJ's adherence to the *Craig* framework. Rather, he challenges some of the conclusions drawn, in its application. Most notably, the plaintiff argues that the AlJ improperly concluded that the "claimant has attempted to minimize his history of drug abuse," which "significantly detracts" from the plaintiff's credibility. (R. at 25.) The Court would agree with the plaintiff that the ALJ's reasoning is unpersuasive. The Court need not look any further than the decision itself, which reads:

> In assessing claimant's credibility, I must also consider his history of substance abuse. He has been evasive about his history of substance abuse. For example, he denied to Dr. Kieth that he had any history of using illicit substances, but admitted to Dr. Kazaglis that he had a history of drug abuse and testified that he was sent to classes for drug abuse. At AnMed there was evidence of drug-seeking or psychogenic behavior. He also testified that he has bought drugs on the street.

(R. at 25.) So, in arguing that the plaintiff has not been forthcoming about his substance abuse, the ALJ recites one instance of evasiveness and two instances of forthrightness. On its face, the logic does not withstand review. The matter might be otherwise largely inconsequential but for the ALJ's indication that this alleged dishonesty had the effect of "significantly detract[ing]" from the plaintiff's credibility. *Id*. In other words, the mischaracterization made an impact on the credibility determination too large for the Court to ignore.

The ALJ also found the claimant not credible because his physicians have noted "functional overlay" (R. at 404); that he had an "exaggerated pain response" (R. at 378); that

17

he "used medication [inhalers for breathing] improperly" (R. at 334); and a physician once wondered whether the claimant's pain was about drug-seeking or "psychogenic problems" (R. at 378). (R. at 24.) The plaintiff argues that all of these observations are consistent with the diagnosis by Dr. Hammond of a somatoform disorder (R. at 470) and Dr. Wiley's observation that the claimant's physical symptoms worsen his psychiatric condition (R. at 506).

It is true that somatization is the perception of psychological impairments as physical ones. (R. at 451.) It seems that this effect does not really go necessarily to credibility. *Id*. In other words, an individual may be in error regarding the source of their pain or symptom and yet still not be lying about it. As recited immediately above, the ALJ gave a range of bases to further discount the plaintiff's credibility. To the extent he expressly included among them the plaintiff's "functional overlay," or somatization, without additional explanation, it is unclear whether or not the ALJ has improperly discounted the plaintiff's credibility for what may amount to a truthful although misunderstood allegation of pain or symptomology. Since the case should be remanded for a reconsidered treatment of the plaintiff's credibility for other reasons, the matter of the plaintiff's somatization should be more clearly discussed.

The Court, therefore, need not reach some of the plaintiff's other objections to the ALJ's credibility analysis. The undersigned has identified enough that the whole matter should be reopened.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, the Court cannot conclude that the ALJ's decision to deny benefits was supported by substantial evidence. It is, therefore, recommended, for the foregoing reasons, that the Commissioner's decision should be reversed and remanded under sentence four of 42 U.S.C. § 405(g) to the Commissioner for further proceedings as set forth above. *See Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

IT IS SO RECOMMENDED

                s/Bruce Howe Hendricks
                United States Magistrate Judge

December 20, 2010
Greenville, South Carolina